UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DOUKAS P. SIOTKAS,                                          :
                                                           :
                    Plaintiff,                             :      **MEMORANDUM**
                                                           :      **& ORDER**
         -against-                                         :      **01-CV-6242 (SMG)**
                                                           :
LABONE, INC., MICHAEL PEAT, and ALAN                       :
DAVIS,                                                     :
                                                           :
                    Defendants.                            :
-------------------------------------------------------------x
-------------------------------------------------------------x
CAROLINE J. VAN HEULE,                                     :
                                                           :
                    Plaintiff,                             :
                                                           :
         -against-                                         :      **01-CV-6243 (SMG)**
                                                           :
LABONE, INC., MICHAEL PEAT, and ALAN                       :
DAVIS,                                                     :
                                                           :
                    Defendants.                            :
-------------------------------------------------------------x
GOLD, STEVEN M., *United States Magistrate Judge*:

## INTRODUCTION

Plaintiffs bring these related actions alleging that LabOne, Inc., a drug testing laboratory,

"falsely accus[ed] countless individuals of substituting their urine specimen." Siotkas Compl.

¶ 2; Van Heule Compl. ¶ 2. Both plaintiffs were airline employees required to undergo drug

testing pursuant to federal statutes and regulations. Their urine specimens were sent to and

analyzed by defendant LabOne, which ultimately reported to their employer, Delta Air Lines, Inc.

("Delta"), that the specimens were "substituted," or not consistent with normal human urine.

Both employees lost their jobs with Delta as a consequence of the reported test results, although

Siotkas' employment was ultimately restored. Plaintiffs assert claims for tortious interference

with their employment, fraud, negligence, intentional tort, prima facie tort, and deceptive business practices.

Defendants have filed motions to dismiss the complaints, arguing that comprehensive federal drug-testing regulations preempt plaintiffs' state common-law causes of action. Defendants also contend that plaintiffs' complaints fail to state causes of action under New York state law with respect to intentional interference with employment relations, fraud, intentional tort, and prima facie tort. In addition, Van Heule has filed a motion for partial summary judgment.

While the motions were pending, the Second Circuit decided *Drake v. Laboratory Corp. of America Holdings*, 458 F.3d 48 (2d Cir. 2006), which specifically addressed the question of "whether and to what extent federal statutes and regulations concerning drug testing of persons employed in the aviation industry preempt the application of state tort law to events arising out of such drug tests." *Drake*, 458 F.3d at 51-52. The Second Circuit held that "state tort claims are preempted to the extent that [a plaintiff] asserts that [a drug-testing laboratory] violated state . . . drug-testing standards that are independent of federal law," *id*. at 52, because "state law cannot 'enlarg[e] or enhance[e]' the regulations to impose burdens more onerous than those of the federal requirements on matters addressed by the federal regulations." *Id*. at 65 (citation omitted). The Court further held, however, that state tort claims are not preempted when they are based on allegations that a defendant "engaged in wrongful behavior not addressed by federal law," or when "state-law causes of action do no more than provide remedies for violations of the federal regulations." *Id*. at 52.

After *Drake* was decided, the parties filed supplemental memoranda of law addressing its

impact on plaintiffs' claims. The parties also consented to have the case assigned to me for all purposes. I then heard oral argument on the motions and received post-argument briefing. For the reasons stated below, the motions to dismiss are granted in part and denied in part and Van Heule's motion for partial summary judgment is denied.

## BACKGROUND

*A.      Regulatory Framework Governing Drug Testing of Aviation Employees*

To understand the parties' preemption arguments, it is useful to begin with a brief review of the relevant federal drug-testing statutes and regulations. The Federal Aviation Act ("FAAct") grants the Federal Aviation Administration ("FAA") broad powers to adopt the necessary regulations to ensure air safety and security. 49 U.S.C. § 44701(a)(5). In 1988, the FAA issued regulations mandating that all "safety-sensitive" aviation employees, such as pilots and flight attendants, be subjected to pre-employment and random drug testing.[1] 14 C.F.R. pt. 121, App. I. The FAA regulations incorporate by reference the drug testing procedures established by the Department of Transportation ("DOT"). *Id.* § 1.B. The protocols established by the DOT are codified at 49 C.F.R. pt. 40. As noted by the Second Circuit in *Drake*, the DOT procedures "set out elaborate rules for conducting drug tests." *Drake*, 458 F.3d at 57. For example, the DOT regulations dictate various aspects of the collection process, 49 C.F.R. §§ 40.31-79.73, such as who may collect urine specimens, *id.* § 40.31, and what forms must be used for collection, *id.*

---

[1] In 1991, Congress enacted the Omnibus Transportation Employee Testing Act ("OTETA" or "Testing Act"), codified at 49 U.S. §§ 45101 *et seq*. The OTETA, however, does not supersede the 1988 FAA regulations; rather, there is significant overlap between the two federal guidelines. Moreover, the Second Circuit concluded in *Drake* that the FAA regulations' preemption clause was broader than that of the OTETA. *Drake*, 458 F.3d at 57. Accordingly, resolution of the preemption issues raised in this case is controlled by the FAA regulations and not the OTETA.

§ 40.45. Subpart F of the current DOT regulations prescribes the responsibilities of laboratories conducting drug testing, including the requirements for conducting validity testing. 40 C.F.R. §§ 40.89-40.95.

The FAAct does not provide for a private right of action. *See Drake*, 458 F.3d at 57. The FAAct does, however, have a "savings clause," which explicitly provides that the remedies for violations are not limited to those in the FAAct. 49 U.S.C. § 40120(c) ("A remedy under this part is in addition to any other remedies provided by law."). *See also Drake*, 458 F.3d at 58. Thus, plaintiffs may pursue state-law causes of action based on violations of federal laws and regulations so long as they are not preempted by the federal statutes or regulations.

To ensure that they are applied "in a 'consistent and uniform' manner," the FAA drug-testing regulations include a preemption provision. *Drake*, 458 F.3d at 62 (*quoting* 53 Fed. Reg. at 47048). This provision expressly "preempts any state or local law, rule, regulation, order, or standard covering the subject matter of [the regulations], including but not limited to, drug testing of aviation personnel performing safety-sensitive functions." 14 C.F.R. Pt. 121, App. I § XI.A. State criminal laws are expressly not preempted; the regulations "do[] not preempt provisions of state criminal law that impose sanctions for reckless conduct of an individual that leads to actual loss of life, injury, or damage to property whether such provisions apply specifically to aviation employees or generally to the public." *Id.* § XI.B.

The drug tests at issue here were conducted by a private laboratory. Private laboratories such as LabOne must adhere to the DOT regulations as well as regulations issued by other government agencies. The Department of Health and Human Services ("HHS") oversees the National Laboratory Certification Program ("NLCP") and is responsible for establishing drug-

testing policies. Def. R.56.1 ¶ 2.[2]  NLCP-certified laboratories, such as LabOne, are required to

comply with all Program Documents ("PDs") issued by HHS.  *Id.* ¶¶ 3, 4.

On September 28, 1998, HHS issued Program Document 35 ("PD 35"), offering

"guidance" for laboratories conducting validity testing.  The DOT regulations explain that

> Specimen validity testing is the evaluation of the specimen to
> determine if it is consistent with normal human urine.  The purpose
> of validity testing is to determine whether certain adulterants or
> foreign substances were added to the urine, if the urine was diluted,
> or if the specimen was substituted.

49 C.F.R. § 40.89(a).  Insofar as relevant to plaintiffs' cases, HHS indicated in PD 35 that a

laboratory should report a specimen as "substituted" if "the creatinine concentration is ≤ 5 mg/dL

and the specific gravity is ≤ 1.001 or ≥ 1.020."  PD 35 Section A.2.b.  Although PD 35 does not

indicate whether a laboratory must measure the creatinine concentration to at least one decimal

point, it requires that tests for creatinine concentration and specific gravity shall "follow

scientifically suitable methods and produce results which are accurately quantified."  PD 35

Section A.1.a.

On July 28, 1999, HHS clarified this ambiguity in PD 35 and definitively stated that

> truncating a quantitative value is not acceptable with "≤" decision
> points or cutoffs.  In "≤" scenarios, truncating would change the
> result from acceptable to unacceptable (e.g., truncating . . . a
> creatinine of 5.4 mg/dL to 5 mg/dL).  Values from tests for
> creatinine (≤5 mg/dL) . . . should contain one significant decimal
> place more than that specified in the stated decision point.

Program Document 37, Issue 5, Comment.

---

[2] "Def. R.56.1" refers to Defendants' Rule 56.1 Statement submitted in opposition to Van
Heule's motion for partial summary judgment.

5

B.       *Plaintiffs' Claims*

With this regulatory framework in mind, plaintiffs' claims – and in particular the preemption arguments made by the parties with respect to them – may be analyzed.  Both plaintiffs allege that LabOne negligently and even intentionally failed to conduct proper validity tests of plaintiffs' specimens, and inaccurately reported to Delta, plaintiffs' employer, that their specimens were "substituted."

Caroline Van Heule completed her training to become a Delta flight attendant on November 11, 1998.  Van Heule Compl. ¶ 12.  On or about November 4, 1998, prior to starting her employment, Van Heule was required to submit to a drug test pursuant to federal law, as discussed above.  *Id.* ¶¶ 13-14.  Plaintiff complied and her urine specimen was sent to defendant LabOne for analysis.  *Id.* ¶¶ 15, 16.  Before testing her specimen for the presence of any drugs, however, LabOne conducted a validity test.  *Id.* ¶ 18.  The validity test results for Van Heule's specimen indicated a specific gravity of 1.001 and a creatinine level of 5 mg/dL.  *Id.* ¶ 20.  *See also id.* Ex. A.  A corroborating validity test was performed with the same results.  *Id.* ¶ 25.  Based on these results and pursuant to PD 35, LabOne then reported to Delta's Medical Review Officer ("MRO") that the specimen was "substituted: not consistent with normal human urine."  *Id.* ¶ 26.  Thereafter, Delta's MRO informed Van Heule of the results and her employment was terminated.  *Id.* ¶¶ 30, 31.

More than two years later, by letter dated January 2, 2001, LabOne notified Delta that HHS had conducted a special inspection of LabOne and other certified laboratories "to determine whether th[e] laboratories ha[d] properly implemented HHS guidance on validity testing."  *Id.* ¶ 41.  In its letter, LabOne informed Delta:

> As a result of the inspection at LabOne, Inc. it was discovered that between September 28, 1998 and January 22, 2000, [LabOne] did not measure the creatinine concentration of specimens to at least one decimal place. This problem affected any specimen that was reported as 'substituted' where that report was based, in part, on a creatinine concentration that fell directly on the decision point of 5 mg/dL.

Van Heule Reply Aff. Ex. A. More specifically, it appears that LabOne rounded or truncated their measurements so that a creatinine level in the range of 4.5 to 5.4 mg/dL was reported as a 5. LabOne informed Delta that Van Heule's specimen validity testing results fell on the decision point of 5 mg/dL. *Id.* "Consequently, [LabOne] do[es] not know whether such a result really meets HHS criteria for determining that a specimen is substituted. Under these circumstances, we cannot permit a substitution result for this test to stand, and the test must be cancelled." *Id.*

Plaintiff Doukas B. Siotkas was employed as a pilot by Delta in 1999. Siotkas Compl. ¶ 14. On July 30, 1999, Siotkas was told to report for a random drug test. *Id.* ¶¶ 15, 16. Siotkas provided a urine specimen that was sent to LabOne, which conducted a validity test on the sample. *Id.* ¶¶ 16-20. The validity test results for Siotkas indicated a creatinine level of 0 mg/DL and a specific gravity of 1.000. *Id.* ¶ 22. Based on these results and pursuant to PD 35, LabOne concluded that Siotkas' sample was "substituted." *Id.* ¶ 23. Following the same procedures as it did in Van Heule's case, LabOne conducted a corroborating validity test with the same result as the initial validity test. *Id.* ¶¶ 27, 28. On August 2, 1999, LabOne reported its finding that Siotkas had supplied a "substituted" sample to Delta's MRO. *Id.* ¶ 31. Delta's MRO then reported the results to Siotkas, who was removed from his position as a pilot. *Id.* ¶ 35, 36.

Shortly thereafter, Delta notified the FAA of Siotkas' drug test results. *Id.* ¶ 37. The FAA then revoked Siotkas' certificate as a pilot and Delta terminated his employment. *Id.* ¶¶ 38,

39.    The Air Line Pilots Association then filed a grievance on behalf of Siotkas which resulted in

proceedings before the National Transportation Safety Board ("NTSB").  *Id.* ¶¶ 41, 42; *see also*

Tr. 5.[3]  In connection with the NTSB proceedings, the FAA concluded in September 2000 that

"LabOne had no reason to report that Siotkas substituted his specimen and that LabOne did not

have specimen-testing procedures and protocols designed to accurately test and report on

specimen validity."  *Id.* ¶ 44.  The FAA advised Delta that "findings of substituted urine samples

reported by LabOne were scientifically unreliable and that substitute specimen test reports by

LabOne should be disregarded."  *Id.* ¶ 47.  Delta then terminated its contract with LabOne.  *Id.*

¶ 48.  At or about the time of the FAA findings, Siotkas' employment as a pilot with Delta was

restored.  *Id.* ¶¶ 45, 46.

Although the grounds for reporting plaintiffs' specimens as substituted were different –

Van Heule had a creatinine level that fell on the decision point of 5 mg/dL, whereas Siotkas had

a creatinine level of 0 mg/dL – both plaintiffs make similar claims with respect to LabOne's

reporting of creatinine levels.  Both plaintiffs contend that LabOne failed to implement PD 35.

Siotkas Compl. ¶¶ 51 *et seq.*; Van Heule Compl. ¶ 53.  Siotkas also alleges that, by using the

same aliquot for the creatinine and specific gravity tests, LabOne violated PD 37, which was not

yet in effect at the time of Van Heule's specimen testing.  Siotkas Compl. ¶¶ 57, 58.  In addition,

both plaintiffs allege negligence by LabOne with respect to its testing procedures more generally,

including its use of de-ionized water as opposed to distilled water in its equipment, its use of

reagents designed to analyze blood rather than urine, and its practice of ignoring equipment error

[3] "Tr." refers to the Transcript of the Oral Argument held before me on October 23, 2007, Docket Entry 86.

messages. Siotkas Compl. ¶¶ 62, 64, 65-66; Van Heule Compl. ¶ 53. Moreover, plaintiffs allege that LabOne failed to employ supervisors with the credentials required by federal law. Siotkas Compl. ¶¶ 73-83; Van Heule Compl. ¶ 53. Finally, plaintiffs contend that employees of LabOne altered business records to conceal their negligence. Siotkas Compl. ¶¶ 84-90; Van Heule Compl. ¶ 53.

## DISCUSSION

*Standards Governing a Motion to Dismiss*

The Federal Rules of Civil Procedure require only that a complaint set out a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8. Motions to dismiss address the sufficiency of a plaintiff's complaint, not the weight of his evidence, and a court deciding a motion to dismiss must accept the allegations in the complaint as true and draw all inferences in favor of the non-moving party. *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).

For many years, courts construing Rule 12 motions applied the rule set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957), that a complaint should be dismissed only if "it appear[ed] beyond doubt that the plaintiff c[ould] prove no set of facts in support of his claim which would entitle him to relief." The Supreme Court, however, has now abandoned the *Conley* "no set of facts" formulation and instead adopted a "plausibility standard." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, __, 127 S. Ct. 1955, 1968-69 (2007). Under this standard, to survive a motion to dismiss, a complaint must allege facts sufficient "to raise a reasonable expectation that discovery will reveal evidence" to support the plaintiffs' claims. *Id.* at 1965. The Second Circuit has interpreted *Twombly*

> not [as] requiring a universal standard of heightened fact pleading,
> but . . . instead [as] requiring a flexible 'plausibility standard,'
> which obliges a pleader to amplify a claim with some factual
> allegations in those contexts where such amplification is needed to
> render the claim *plausible*.

*Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). However, "[o]nce a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Thus, some amount of factual detail is now required to survive a Rule 12(b)(6) motion to dismiss. On the one hand, a complaint with only "labels and conclusions, and a formulaic recitation of the elements of a cause of action" is insufficient; on the other hand, a complaint should not be dismissed so long as plaintiffs provide sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at _, 127 S. Ct. at 1965.

## I.     Preemption

Defendants argue that plaintiffs' complaints fail to state claims upon which relief can be granted because the federal drug-testing statutes and regulations preempt their state common law claims in their entirety. As noted earlier, the FAA drug-testing regulations explicitly provide that "any state . . . law, rule, regulation, order, or standard" covering drug-testing of aviation personnel is preempted. 14 C.F.R. Pt. 121, App. I, § XI.A.

### A.     Supreme Court Precedent

Over the last twenty years, the Supreme Court has analyzed the preemptive effect of various statutes and regulations. The discussions in the following significant cases provide a framework for analyzing the parties' positions with respect to whether plaintiffs' claims are preempted.

In *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S. Ct. 2608 (1992), the Supreme

Court considered the preemptive scope of the Federal Cigarette Labeling and Advertising Act

and the Public Health Cigarette Smoking Act of 1969. The preemption provision in *Cipollone*

provided: "No requirement or prohibition based on smoking and health shall be imposed under

State law with respect to the advertising or promotion of any cigarettes the packages of which are

labeled in conformity with the provisions of this Act." *Cipollone*, 505 U.S. at 515, 112 S. Ct. at

2617 (*quoting* 15 U.S.C. § 1334(b)). The Court emphasized "the presumption against the

preemption of state police power regulations," *id.* at 518, 112 S. Ct. at 2618, and narrowly

applied the preemption provision before it to each of petitioner's common law claims. Thus, for

example, petitioner's breach of warranty claim was allowed to proceed because the liability

petitioner sought to impose derived from the manufacturer's warranty and not a duty "imposed

under state law," and his fraudulent misrepresentation claims were held not to be preempted even

to the extent based on representations made in advertisements, because the claims were

"predicated not on a duty 'based on smoking and health' but rather on a more general obligation

– the duty not to deceive." *Id.* at 525-29, 112 S. Ct. at 2622-24. The Court concluded that "there

is no general, inherent conflict between federal pre-emption of state warning requirements and

the continued vitality of state common-law damages actions. . . . [The provision at issue] is best

read as having superseded only positive enactments by legislatures or administrative agencies

that mandate particular warning labels." *Id.* at 518-19, 112 S. Ct. at 2618-19.

A few years later, the Court in *Lohr v. Medtronic, Inc.*, 518 U.S. 470, 491, 116 S. Ct.

2240, 2253 (1996), considered the preemption clause in the Medical Device Amendments of

1976 ("MDA"), 21 U.S.C. § 360k. Petitioner Lohr, who was injured when her pacemaker failed,

sued the manufacturer of the device for negligence. The MDA's preemption clause states as follows:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement--
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). The Supreme Court, as it did in *Cippolone*, emphasized that the presumption against preemption supports a narrow interpretation of such clauses, and that the scope of a preemption clause must be determined according to Congress' purpose, as expressed in statutory language. *Lohr*, 518 U.S. at 485-86, 116 S. Ct. at 2250-51. The Court then held that § 360k did not preempt Lohr's claims, noting that Congress would not lightly bar persons injured by defective medical devices from obtaining relief, and that, "if Congress intended to preclude all common-law causes of action," it could have done so explicitly by precluding "any 'remedy' under state law." *Id.* at 487, 116 S. Ct. at 2251. Even violations of federal regulations could provide a basis for a state common law claim provided the state law claim did not seek to impose requirements "different from or in addition to" those imposed under federal law; "[n]othing in § 360k denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Id.* at 495, 116 S. Ct. at 2255. Put differently, for preemption to apply, "[s]tate requirements must be 'with respect to' medical devices and 'different from, or in addition to,' federal requirements." *Id.* at 500, 116 S. Ct. at 2257. Pointing out the general applicability of duties imposed by state common law, and

12

that those duties do not arise only with respect to medical devices, the Court concluded that

> The legal duty that is the predicate for the Lohrs' negligent manufacturing claim is the general duty of every manufacturer to use due care to avoid foreseeable dangers in its products. . . . These general obligations are no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a work force. These state requirements therefore escape pre-emption . . . because their generality leaves them outside the category of requirements that [the MDA] envisioned . . . [would be preempted].

*Id.* at 501-02, 116 S. Ct. at 2258.

The Supreme Court considered the MDA's preemption clause again in *Riegel v. Medtronic*, _ U.S. _, 128 S. Ct. 999 (2008). Petitioner in *Reigel* alleged that a balloon catheter was designed, labeled and manufactured defectively in violation of New York common law. *Id.* at 1005. The catheter, however, had gone through an extensive pre-market approval process conducted by the Federal Food and Drug Administration (the "FDA") which involved the safety and labeling of the catheter and essentially imposed federal requirements on the catheter's design, manufacture and labeling. *Id.* at 1004, 1007. Because petitioner's common law claims essentially sought to impose additional, different safety requirements, the Supreme Court held that the claims were preempted. *Id.* at 1008. Nevertheless, the Court reaffirmed that the MDA "does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements" and are therefore not "different from, or in addition to" those requirements. *Id.* at 1011.

The Supreme Court recently had occasion to revisit the Federal Cigarette Labeling and

Advertising Act (the "Labeling Act") in *Altria Group, Inc. v. Good*, _ U.S. _, _ S. Ct. _,

*available at* 2008 WL 5204477 (Dec. 15, 2008). Respondents in *Altria* claimed that petitioners,

cigarette manufacturers, violated a state unfair trade practices statute by fraudulently marketing

"light" cigarettes in a manner suggesting them to be less dangerous than regular cigarettes.

Petitioners invoked the preemption clause of the Labeling Act, which prohibits states from

requiring additional statements relating to smoking and health on cigarette packages, and further

provides that states may not impose requirements or prohibitions "based on smoking and health

. . . with respect to the advertising or promotion of any cigarettes the packages of which are

labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b). Although the

respondents contended that petitioners' false statements concerned the relative health risks of

"light" as opposed to regular cigarettes, the Supreme Court held that their claims were not

preempted by the Labeling Act:

> To be sure, the presence of the federally mandated warnings may
> bear on the materiality of petitioner's allegedly fraudulent
> statements, "but that possibility does not change [respondent's]
> case from one about the statements into one about the warnings.

2008 WL 5204477, at *6. The Supreme Court went on to explain that the phrase in the Labeling

Act's preemption clause, "based on smoking and health," when narrowly construed, "does not

encompass the more general duty not to make fraudulent statements." *Id*. at *9.

These Supreme Court preemption decisions demonstrate that state remedies for violations

of the FAAct and its regulations should not be preempted in their entirety; rather, the question is

the scope of any preemption. So long as the state law remedies plaintiffs seek "parallel" federal

law – i.e., so long as they do not impose requirements inconsistent with those mandated by

federal law and do not otherwise interfere with the FAAct and its regulations – *Reigel*, *Lohr*, *Cipollone* and *Altria* suggest that the state common law claims asserted in this case are not preempted.

B.     The Second Circuit's Decision in <u>Drake</u>

As noted above, the Second Circuit held in *Drake* that state law causes of action are not preempted by federal drug-testing laws where the state law claims simply provide remedies for violations of the federal laws and regulations or for wrongful conduct not addressed by those laws and regulations.  Like plaintiffs Siotkas and Van Heule, Drake was a Delta employee subject to mandatory drug testing whose test results indicated that his specimen was "adulterated."[4]  *Drake*, 458 F.3d at 51.  As a result, Delta terminated Drake's employment.  *Id.* Drake then brought suit, asserting eight causes of action including, *inter alia,* claims of negligence, tortious interference with economic relations, and misrepresentation.  *Id.* at 54.  As described by the Second Circuit,

> Drake's central theory of negligence under New York state law is that while conducting Drake's drug test, the defendants repeatedly "ignored industry standards and protocols for random drug-tests" as well as federal drug-testing regulations prescribed by the Department of Health and Human Services, the Substance Abuse and Mental Health Services Administration, and the Department of Transportation ("DOT").  Drake's other state common-law claims are also based on the defendants' alleged violation of industry standards and federal regulations pertaining to drug testing.  Drake further alleges that the defendants violated New York common law by making false statements to Drake's employer.

---

[4] An "adulterated specimen," at the times pertinent in *Drake*, was defined as "a specimen that contains a substance that is not expected to be present in human urine, or contains a substance expected to be present but [that] is at a concentration so high that it is not consistent with human urine."  *Drake*, 458 F.3d at 51 n.1 (*quoting* 49 C.F.R. § 40.3) (internal quotation marks omitted).

*Id.* (citation omitted).

Defendants filed a motion to dismiss before the district court on multiple grounds, including preemption. The district court held that the FAA regulations and federal statutes did not preempt Drake's claims. Rather, after thoroughly examining the language of the relevant statutes and regulations, as well as their legislative histories and purpose, the district court concluded that "the statutory and regulatory language, and their collective underlying purpose, *compel* the conclusion that neither the preemption provisions nor the FAA drug testing regulations were expressly or impliedly intended to preclude *any* common law tort claims." *Drake v. Lab. Corp. of Am. Holdings, Inc.*, 290 F. Supp. 2d 352, 364-73 (E.D.N.Y. 2003) (first emphasis added). Noting a conflict in the relevant precedents from other circuit courts, the district court authorized an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

The Second Circuit in essence affirmed the district court's decision, although its reasoning was not entirely the same. The Circuit held that

> Drake's state tort claims are preempted to the extent he asserts that defendants-appellants violated state common-law drug-testing standards that are independent of federal law. But Drake's claims are not preempted insofar as he alleges that the defendants-appellants engaged in wrongful behavior not addressed by federal law, or insofar as his state-law causes of action do no more than provide remedies for violations of the federal regulations.

*Drake*, 458 F.3d at 52. With respect to Drake's claims based upon standards of care imposed by state common law, the Second Circuit noted that, "[a]lthough they set out elaborate rules for conducting drug tests, the DOT regulations do not specifically address negligence on the part of drug-testing laboratories or otherwise establish the minimum standard of care to be exercised by laboratory personnel." *Id.* at 57. The Court also pointed to DOT regulations stating that

employees "may not be required to waive liability with respect to negligence on the part of any person participating in the collection, handling or analysis of the specimen . . .," 49 C.F.R. § 40.25(e)(22)(ii), and concluded that this prohibition against waiver "suggests that negligence claims may be brought" against a drug-testing laboratory. *Id.* at 61. However, the Court emphasized that "state law cannot 'enlarg[e] or enhanc[e]' the regulations to impose burdens more onerous than those of the federal requirements," and held that "if Drake is asserting that conduct addressed by the federal regulations is 'wrongful' under state law although it does not violate the federal regulations, such claims are preempted." *Id.* at 65 (alteration in original). Thus, for example, the Court held that Drake's negligence claim based on violations of "industry standards and protocols" was preempted "to the extent that it refers to 'standards and protocols' other than those in the federal regulations." *Id.*[5]

In connection with those of Drake's claims based on violations of FAA regulations, the Court stressed that the FAAct provides that "[a] remedy under this part is in addition to any other remedies provided by law." *Id.* at 58. While preemption applies to a state law claim that "interferes with the FAA's stated desire to regulate such drug testing in a 'consistent and uniform' manner," *id.* at 62, (*quoting* 53 Fed. Reg. at 47048), Drake's state-law causes of action were held not to be preempted to the extent they sought remedies for violations of federal regulations. S*ee id.* at 64 (recognizing that, "under the FAAct and other federal laws, the federal government's intent to preempt substantive state-law *standards* does not necessarily imply an

---

[5] On remand, the district court dismissed Drake's claims for tortious interference, negligent misrepresentation, negligent infliction of emotional distress, and civil conspiracy for failure to state claims but allowed his negligence claim to go forward. *Drake v. Lab. Corp. of Am. Holdings*, 2007 WL 776818 (E.D.N.Y. Mar. 13, 2007), *reconsideration denied*, 2007 WL 1704643 (June 13, 2007).

intent to preempt state-law *remedies* for violations of federal standards").

C.      *Analysis of Plaintiffs' Claims*

As the discussion above makes clear, not all common law claims are preempted by the FAAct and OTETA and their implementing regulations. The question presented here is the extent to which the scope of the relevant preemption clauses encompasses the claims asserted by plaintiffs.

In their pleadings, plaintiffs assert five grounds for their common-law claims: 1) defendants violated PDs 35 and 37, 2) defendants ignored error messages on testing machines and failed to follow proper protocols when error messages occurred, 3) defendants did not adhere to general standards of care (for example, by using de-ionized water as opposed to distilled water and reagents designed to analyze blood rather than urine), 4) defendants failed to have properly credentialed personnel, and 5) defendants intentionally altered records to conceal wrongdoing. Siotkas Compl. ¶¶ 55, 57, 58, 62, 64-66, 73-90; Van Heule Compl. ¶ 53. Van Heule asserts as an additional basis for her claims that defendants were negligent in the testing of her specimen because they improperly truncated or rounded her creatinine level result. Van Heule Compl. ¶ 53. As noted earlier, Siotkas has an additional allegation that LabOne violated PD 37 by using the same aliquot for the creatinine and specific gravity tests. Siotkas Compl. ¶¶ 57, 58.

As discussed in detail above, *Drake* held that state law claims are not preempted by federal drug-testing laws where the claims simply provide remedies for violations of the federal laws and regulations or for wrongful conduct not addressed by those laws and regulations. *Drake* teaches that, to determine whether claims avoid preemption on these grounds requires a close comparison of the pertinent federal regulations to the standards upon which plaintiffs base

18

their claims.  *Drake*, 458 F.3d at 63 ("[T]he preemption analysis . . . can only be conducted by examining the contours of the state law . . . in question and its relationship to the FAA's drug-testing program.") (internal quotation marks and citation omitted).  Accordingly, during oral argument on the motions, I asked plaintiffs to supplement their briefing by clearly identifying which of their contentions is based on an alleged violation of a federal regulation (and which regulation was violated), and which alleges wrongful conduct that is "not addressed" by federal drug-testing laws and regulations.  Tr. at 33-34.  Although plaintiffs did submit a post-hearing letter, Docket Entries 85 in *Siotkas* and 67 in *Van Heule,* it does not contain the contention-by-contention analysis I anticipated.  Plaintiffs do make clear, however, that they rely on PDs 35 and 37 and certain specified regulations, at least to the extent their claims are based on conduct addressed by federal laws and regulations, and that they rely on general standards of care insofar as their contentions involve other conduct.  Plaintiffs also expressly disavow any reliance on standards of care or testing protocols that are inconsistent in any way with the pertinent regulations or PDs.  In their response to plaintiffs' post-hearing letter, Docket Entries 87 in *Siotkas* and 68 in *Van Heule*, defendants argue vigorously that, as a factual matter, they complied with the applicable PDs and regulations, but they do not identify any particular standard of care or requirement plaintiffs seek to impose that is inconsistent with or contrary to any federal laws or regulations.

My review of the pertinent regulations leads me to conclude, at least at this stage of the litigation, that plaintiffs' claims do not attempt to "enhance or enlarge" the requirements imposed by the applicable federal regulations, *Drake*, 458 F.3d at 65, and that permitting them to proceed would not "interfere[] with the FAA's . . . desire to regulate . . . drug testing in a 'consistent and

uniform' manner," *id.* at 62.  For example, plaintiffs allege that defendants failed to employ

properly certified laboratory personnel.  Siotkas Compl. ¶¶ 73-83; Van Heule Compl. ¶ 53.  More

specifically, plaintiffs allege that LabOne employed a "responsible person" ("RP") who "lacked

the credentials to be [an] RP" and a quality control supervisor who "lacked proper training and

was not credentialed in urine specimen testing."  Siotkas Compl. ¶¶ 76, 80; *see also* Van Heule

Compl. ¶ 53 (seventh and eighth bullet points).  The regulations in effect at the time plaintiffs'

specimens were tested required that certain laboratory personnel have minimal qualifications, and

that all laboratory personnel "have the necessary training and skills for the tasks assigned."  *See*

49 C.F.R. § 40.27 (1998), (1999).  Accordingly, unless plaintiffs seek to impose credentialing

requirements more rigorous than or otherwise inconsistent with those set forth in the federal

regulations, this aspect of their claims would not be preempted.

Plaintiffs also allege that defendants violated PDs 35 and 37 in several respects.  Siotkas

Compl. ¶¶ 55, 57, 58; Van Heule Compl. ¶ 53.  Plaintiffs' contentions in this regard clearly do

not "enhance or enlarge" the requirements imposed by federal law because defendants are

mandated by statute to comply with all HHS guidelines, including PDs 35 and 37.  *See* 49 U.S.C.

§ 45104(2) (directing the FAA to develop requirements that incorporate HHS laboratory and

testing guidelines).  Thus, plaintiffs' claims that defendants violated the PDs, whether or not

meritorious, are not preempted.

With respect to plaintiffs' contentions that the PDs were violated, defendants focus in

particular on Van Heule's contention that LabOne improperly reported that her specimen was

substituted based on a finding that its creatinine concentration was 5 mg/dL without measuring

the creatinine concentration to at least one decimal place.  Van Heule Compl. ¶¶ 42-46.  As

defendants point out, PD 35, the Program Document in effect at the time Van Heule's specimen was tested, provided that a specimen should be reported as substituted "if the creatinine concentration is ≤5 mg/dL." PD 35 Section A.2.b. While, as defendants argue, plaintiffs may not seek to impose a different standard for determining whether a specimen is substituted, the question remains whether defendants exercised reasonable care when they determined and reported that Van Heule's specimen was substituted without testing the creatinine level to at least one decimal place; had they done so and learned, for example, that the level was 5.1 mg/dL, they presumably could not have accurately reported that the specimen had a level ≤5 mg/dL.

Plaintiffs' remaining claims are based on breaches of more general common law standards of conduct, such as duties to ensure that equipment is functioning properly, to follow scientifically reliable methods, and not to commit intentional torts. Such claims are not preempted, provided they do not seek to impose standards or protocols different from those mandated by federal law. Thus, absent contrary federal requirements, *Drake*'s holding would not preempt state common law claims alleging, for example, that laboratory personnel carelessly used testing equipment they knew or should have known was not working properly, or carelessly failed to follow the operating instructions for the equipment. Rather, "[t]he legal duty that is the predicate for [such claims] is the general duty of every [laboratory] to use due care . . . ." and these general obligations "escape pre-emption." *Lohr*, 518 U.S. at 501-02, 116 S. Ct. at 2258. Indeed, the federal statutes and regulations themselves strongly suggest that defendants must use, at a minimum, reasonable care when testing for drugs. *See, e.g.*, 49 U.S.C. § 45104(2)(A) (requiring the "use of the best available technology to ensure the complete reliability and accuracy of . . . tests"); *id.* § 45104(4) (requiring drug testing to follow "scientifically recognized

method[s] of testing capable of providing quantitative information about alcohol or a controlled substance"); 49 C.F.R. § 40.29(n)(3) (1998), (1999) (requiring equipment to be "certified for accuracy"); *id.* § 40.29(n)(4) (requiring "written procedures for the actions to be taken when systems are out of acceptable limits or errors are detected"); *id.* § 40.31 (providing that "[d]rug testing laboratories shall have a quality assurance program which encompasses all aspects of the testing process"); PD 35 (mandating that validity tests "follow scientifically suitable methods and produce results which are accurately quantified"); Mandatory Guidelines for Federal Workplace Drug Testing Programs, 53 Fed. Reg. 11,970, 11,984-85 (Apr. 11, 1988), amended by 59 Fed. Reg. 29,908 (June 9, 1994). While *Drake* clearly held that plaintiffs may not seek to impose "additional or other standards and components for drug-testing programs – whether or not inconsistent with the federal requirements," 458 F.3d at 65, the mere fact that common law claims are based upon "events that occur during the course of . . drug testing" does not necessarily warrant their preemption. To the contrary, "negligence claims may be brought" unless they "implicate[] the drug testing of aviation personnel in such a way that it interferes with the FAA's stated desire to regulate such drug testing in a 'consistent and uniform' manner." *Id*. at 61-62.

Indeed, some of plaintiffs' claims are the same as or similar to claims that have been considered by other courts and found not to be preempted. For example, Van Heule's claim of truncating or rounding creatinine results was found not to be preempted by the Ninth Circuit in *Ishikawa v. Delta Airlines, Inc.*, 343 F.3d 1129, 1133 (9th Cir. 2003) ("It is not as though the state law had one creatinine standard, the federal program another."). *See also Drake*, 458 F.3d at 61, 62 (citing *Ishikawa* favorably). In another example, plaintiffs' claims concerning use of de-

ionized water despite the equipment manufacturer's recommendation to use distilled water are similar to claims the Second Circuit held were not preempted in *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 124 (2d Cir. 2006), *aff'd*, _ U.S. _, 128 S. Ct. 999 (2008) ("[T]ort claims that are premised on a manufacturer's deviation from the standards set forth in the device's approved [FDA] application – such as the Riegels' negligent manufacturing claim – are in no way preempted."). Finally, the Second Circuit in *Drake* explicitly stated that intentional torts committed while administering tests are not preempted. 458 F.3d at 62. Plaintiffs' claims that defendants intentionally altered records to conceal wrongdoing would therefore fall outside the scope of the preemption clause in the FAA regulations. In sum, as the Ninth Circuit stated in *Ishikawa*, I "cannot see how the duty the state common law impose[s], that LabOne test urine and report the results with due care, could be inconsistent with the federal guidelines, which require the same thing with more specificity." 343 F.3d at 1132.

Defendants' motions are directed at plaintiffs' pleadings. Although greater specification of the bases for the claims would have been helpful, I am left to consider whether the claims as pled are subject to dismissal on grounds of preemption. As in *Drake*,

> the precise contours of [plaintiffs'] theor[ies] of recovery have not yet been defined. For those claims for which 'preemption cannot be easily determined from the pleadings, our standard of review requires us to affirm the district court's decision to deny the defendants-appellants' motion to dismiss, with the understanding that the claims may ultimately prove to be preempted at a later stage of the litigation.

458 F.3d at 66 (internal quotation marks and citations omitted). For all these reasons, defendants' motions to dismiss on preemption grounds are denied.

*II.*      *Failure to State a Cause of Action under New York Law*

Defendants also move to dismiss the complaints on the ground that plaintiffs' allegations fail to state causes of action under New York law for a) intentional interference with employment relations, b) fraud, and c) intentional and prima facie torts.  Plaintiffs also bring claims for negligence and under New York's General Business Law Section 349, although defendants have not moved to dismiss these claims for failure to state a cause of action.

*A.*      *Tortious Interference with Employment Relations*

A plaintiff claiming tortious interference under New York law must establish four elements: 1) a valid contract, 2) knowledge by a third party of the contract, 3) conduct by the third party to intentionally and improperly procure the breach of the contract, and 4) damage to the plaintiff as a result of the breach.  *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001).  At-will employees, like the plaintiffs here, however, do not have employment contracts.  *Id*.  Nonetheless, an at-will employee may establish a claim for tortious interference if the third party engaged in fraud or misrepresentation or acted with malice.  *Id*.; *see also Dooley v. Metro. Jewish Health Sys.*, 2003 WL 22171876, at *12 (E.D.N.Y. July 30, 2003); *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 194, 428 N.Y.S.2d 628, 634, 406 N.E.2d 445, 451 (1980); *but see McCormick v. Chase*, 2007 WL 2456444, at *2 (S.D.N.Y. Aug. 29, 2007) (dismissing plaintiff's tortious interference with employment claim after concluding that New York does not recognize such a cause of action for at-will employees).

Plaintiffs allege that LabOne "knew that a report that [plaintiffs] substituted [their] specimen[s] would cause Delta to terminate [their] employment" and that they were injured as a result of LabOne's false reports when they lost their jobs.  Siotkas Compl. ¶¶ 39, 103, 104; Van

24

Heule Compl. ¶¶ 32, 59, 60.  Moreover, plaintiffs specifically allege that defendants "acted with malice and/or the utter disregard for the rights" of plaintiffs.  Siotkas Compl. ¶ 105; Van Heule Compl. ¶ 61.  These allegations satisfy the elements of a claim for tortious interference – plaintiffs allege that LabOne had knowledge of plaintiffs' employment with Delta, that LabOne maliciously misrepresented plaintiffs' specimen results, and that plaintiffs lost their positions as a result of LabOne's actions.  Unlike the complaint in *Drake* which simply alleged that defendants made false statements to Delta and failed to allege any fraud, misrepresentation or malice, plaintiffs here sufficiently allege the requisite intent.[6]  Taking the allegations of their complaints as true as I must on a motion to dismiss, plaintiffs state claims for tortious interference with employment relations.

B.       *Fraud*

To establish fraud, plaintiffs must demonstrate "a representation of material fact [by defendant], falsity, scienter, reliance and injury."  *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57, 698 N.Y.S.2d 615, 621, 720 N.E.2d 892, 898 (1999).  Plaintiffs' fraud claims must be dismissed because plaintiffs have failed to plead that they relied on LabOne's false statements.

Courts have reached different results with respect to whether a claim of fraud may be

---

[6] In *Drake*, plaintiff alleged the following facts in support of his claim for tortious interference:

> By falsely and improperly indicating to Delta that Drake had adulterated his urine sample, supplying false and misleading information about the results of Drake's drug test to Delta, and by improper communications with Delta, defendants wrongfully interfered with the performance of Drake's continued contract of employment, causing Drake to be dismissed from his employment with Delta.

2007 WL 776818, at *4.

sustained where the misrepresentation sued upon was made to a third party who relied on the representation to the detriment of plaintiff. *Compare Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund, & Annuity Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998) (holding that "a plaintiff does not establish the reliance element of fraud . . . by showing only that a third party relied on defendant's false statements"), *Trepel v. Dippold*, 2006 WL 3054336, at *5 (S.D.N.Y. Oct. 27, 2006), *Morris v. Castle Rock Entm't, Inc.*, 246 F. Supp. 2d 290, 296 (S.D.N.Y. 2003), *and Briarpatch Ltd., L.P. v. Frankfurt Garbus Klein & Selz, P.C.*, 13 A.D.3d 296, 787 N.Y.S.2d 267 (1ˢᵗ Dep't 2004) *with N.B. Garments (PVT.) Ltd. v. Kids Int'l Corp.*, 2004 WL 444555, at *3 (S.D.N.Y. Mar. 10, 2004) (finding that plaintiff's fraud claim based on third party reliance was cognizable under New York law), *Hyosung Am. Inc. v. Sumagh Textile Co., Ltd.*, 25 F. Supp. 2d 376, 383-84 (1998) (holding that a claim for fraud based on third party reliance is cognizable and distinguishing *Lollo* and citing *Buxton Mfg. Co., v. Valiant Moving & Storage, Inc.*, 239 A.D.2d 452, 657 N.Y.S.2d 450 (2d Dep't 1997), and *Desser v. Schatz*, 182 A.D.2d 478, 581 N.Y.S.2d 796 (1ˢᵗ Dep't 1992)), *and Wey v. N.Y. Stock Exch., Inc.*, 2007 WL 1238596, at *3-5 (N.Y. Sup. Ct. Apr. 10, 2007).

The Second Circuit has recently held, however, that "allegations of third-party reliance . . . are insufficient to make out a common law fraud claim under New York law." *City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425, 454 (2d Cir. 2008) (citing *Lollo* favorably). Here, LabOne may have fraudulently misrepresented facts to Delta, but Siotkas and Van Heule in no way relied on LabOne's reports. Because Siotkas and Van Heule have failed to establish that they relied on defendants' misrepresentations, their fraud claims must be dismissed.

C.      *Intentional and Prima Facie Tort*

Plaintiffs assert claims for intentional and prima facie tort.  Under New York law, these

torts share the following common elements: "(1) the intentional infliction of harm, (2) causing

special damages, (3) without excuse or justification."  *Chen v. U.S.*, 854 F.2d 622, 627 (2d Cir.

1988) (internal quotations and citations omitted).  However, when the facts alleged would give

rise to a traditional common law tort claim, such as one for tortious interference with

employment relations, this is "fatal to a prima facie tort claim (and by analogy, to a claim for

intentional tort) for once a traditional tort is established the cause of action for prima facie tort

[and thus by analogy, for intentional tort] disappears."  *Id.* at 628.  *See also Curiano v. Suozzi*, 63

N.Y.2d 113, 118, 480 N.Y.S.2d 466, 469, 469 N.E.2d 1324, 1327 (1984) ("Prima facie tort is

designed to provide a remedy for intentional and malicious actions that cause harm and for which

no traditional tort provides a remedy.").  Because, as discussed above, the facts alleged in

plaintiffs' complaints give rise to traditional common-law tort claims, plaintiffs' causes of action

for intentional and prima facie tort should be dismissed.  *Chen*, 854 F.2d at 628; *Cuillo v.*

*Shupnick*, 815 F. Supp. 133, 135 (S.D.N.Y. 1993) (dismissing plaintiffs' prima facie tort claims

since other causes of action were available); *Curiano*, 63 N.Y.2d at 117, 480 N.Y.S.2d at 469.

D.      *Deceptive Business Practices*

Although defendants have not moved to dismiss these claims, in the interest of judicial

efficiency, I nonetheless analyze whether they could withstand a motion to dismiss.  New York's

General Business Law Section 349, which is part of New York's Consumer Protection Act, N.Y.

GEN. BUS. LAW art. 22-A, provides that "[d]eceptive acts or practices in the conduct of any

business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

N.Y. Gen. Bus. Law § 349(a).  The statute further provides that "any person who has been injured by reason of any violation of this section may bring an action" for damages.  *Id.* § 349(h).  As the Act's name indicates, its purpose is to protect the consumer public-at-large by ensuring "an honest market place where trust prevails."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 24-25, 623 N.Y.S.2d 529, 532, 647 N.E.2d 741, 744 (1995) (internal quotation marks and citation omitted).  Thus, a plaintiff claiming a violation of Section 349 "must demonstrate that the acts or practices have a broader impact on consumers at large.  Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute."  *Id.* at 25, 623 N.Y.S.2d at 532.  *See also Exxonmobil Inter-America, Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 448 (S.D.N.Y. 2004) ("New York courts have also suggested that a consumer, for § 349 purposes, is one 'who purchase[s] goods and services for personal, family or household use.'").  Moreover, the New York Court of Appeals has held that Section 349 is limited to "transaction[s] in which the consumer is deceived . . . *in New York*."  *Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 863, 774 N.E.2d 1190, 1195 (2002) (emphasis added).  In other words, "to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York."  *Id.* at 325, 746 N.Y.S.2d at 864, 774 N.E.2d at 1195.

Thus, it appears that plaintiffs' Section 349 claims could not withstand a motion to dismiss.  First, plaintiffs have failed to establish that they are "consumers" who deserve protection under Section 349 or that defendants' conduct deceived the consumer public at-large.  Second, plaintiffs fail to plead where the allegedly deceptive acts occurred.  Plaintiffs contend that LabOne's deceptive acts included "holding itself out as a competent laboratory" and

"fail[ing] to render accurate specimen validity tests." Siotkas Compl. ¶¶ 135, 137; Van Heule

Compl. ¶¶ 91, 93. Although plaintiffs do not indicate where LabOne conducted the validity tests,

I note that LabOne is based in Kansas. Siotkas Compl. ¶ 6, Van Heule Compl. ¶ 4. Moreover,

LabOne sent the allegedly inaccurate validity test reports to Delta's MRO in Atlanta. Siotkas

Compl. attachment; Van Heule Compl. Ex. B. Plaintiffs fail to plead where they were when they

were informed of the test reports, although it is not clear that even that fact would be sufficient to

support a claim for deceptive business practices under Section 349.[7] Accordingly, plaintiffs shall

voluntarily withdraw their claims for deceptive business practices or provide a supplemental

memorandum addressing these concerns. *See Perez v. Ortiz*, 849 F.2d 793, 798 (2d Cir. 1988)

(finding that a district court erred in dismissing claims *sua sponte* for failure to state a cause of

action where the court failed to provide plaintiffs notice and an opportunity to be heard).

In sum, defendants' motions to dismiss are granted in part and denied in part.

Defendants' motions to dismiss on the ground that plaintiffs' claims are preempted are denied.

Defendants' motions to dismiss plaintiffs' tortious interference claims are denied. Defendants'

other motions to dismiss are granted and plaintiffs' claims for fraud and intentional and prima

facie tort are all dismissed. With respect to plaintiffs' claims of deceptive business practices,

plaintiffs shall withdraw these claims or submit a memorandum of law explaining why they

should be permitted to proceed no later than January 20, 2009. Accordingly, only plaintiffs'

claims for tortious interference, negligence, and deceptive business practices – if the latter are not

withdrawn and survive motion practice – will proceed.

---

[7] Both plaintiffs were employed by Delta at a New York airport. Nonetheless, the specimen reports indicate that Van Heule's specimen was collected in Atlanta, Georgia, although Siotkas' specimen was collected in New York. Neither complaint states where plaintiffs reside.

*III.    Van Heule's Motion for Partial Summary Judgment*

Van Heule has filed a motion for partial summary judgment with respect to her claims of

tortious interference, negligence, and prima facie tort.[8]   Plaintiff grounds her argument on two

theories: 1) no triable issue of fact exists and 2) the doctrine of collateral estoppel bars LabOne

from re-litigating its negligence, which was established by the decision in *Ishikawa v. Delta*

*Airlines Inc.*, No. CV 00-1284 (D. Or.).  Defendants oppose the motion on both grounds.[9]

*A.    Standards Governing Summary Judgment*

When deciding a motion for summary judgment, a court must assess whether there are

any genuine issues of material fact to be tried.  *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933

F.2d 162, 167 (2d Cir. 1991).  *See also* FED. R. CIV. P. 56(c).  A factual dispute is material if it

"might affect the outcome of the suit under the governing law," and the dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  The court

resolves any ambiguities and draws all reasonable inferences in favor of the nonmoving party.

*See Coach Leatherware Co.*, 933 F.2d at 167.

---

[8] As discussed above, plaintiffs' prima facie tort claims are, as a result of this
Memorandum and Order, dismissed.

[9] In addition, defendants argue that plaintiff's papers in support of her motion suffer from
technical defects.  First, defendants argue that plaintiff's affidavit references information learned
from plaintiff's forensic toxicology "consultant," Dr. Vina Spiehler, whose affidavit was
previously withdrawn by plaintiff.  Def. Opp. 19-20.  Second, defendants contend that plaintiff
lacks personal knowledge of the relevant facts cited in her affidavit.  *Id.* at 21.  Because I do not
rely on any of the disputed factual assertions in reaching my conclusion, I do not address
defendants' contention that plaintiff's motion papers suffer from technical defects.

*B.      Whether Issues of Material Fact Exist*

Plaintiff contends that LabOne's practice of rounding or truncating creatinine levels to whole numbers ("LabOne's practice") violated PD 35 and constitutes negligence.  Pl. Mot. 37-38.  Van Heule's argument, however, fails for two reasons.  First, although a violation of a federal statute or regulation is generally deemed negligence *per se*, *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 318-319, 125 S. Ct. 2363, 2370 (2005), it is not clear that a violation of an agency "guidance" document, such as PD 35, would constitute negligence *per se* because PD 35 is not a federal statute or regulation, *id.*  Second, it is not even clear that LabOne's rounding of creatinine levels violated PD 35, because  PD 35 does not explicitly require testing creatinine levels to at least one decimal place.  Although HHS subsequently clarified in PD 37 that laboratories should measure creatinine levels to at least one decimal place, PD 35 was arguably ambiguous in this regard because it made reference to a creatinine level of "5," not "5.0."  Defendants contend that, at the time plaintiff's specimen was tested, it was standard industry practice to measure creatinine levels to whole numbers.  Def. R.56.1 ¶¶ 26-30.  Defendants thus raise a question of fact as to whether LabOne's practice constituted a violation of PD 35.[10]

With respect to her claim for tortious interference, as discussed above, plaintiff must establish four elements under New York law: 1) a valid contract, 2) knowledge by a third party of

---

[10] Defendants also contend that Van Heule is not entitled to summary judgment on her negligence claim because she has not established that her creatinine level was greater than 5.0, and thus has not established that LabOne's practice proximately caused her any harm.  Van Heule has, however, submitted an affidavit in which she asserts that she did not substitute her urine specimen.  Van Heule Aff. in Supp. of Mot. for Partial Summ. J. ¶ 2.  This allegation is tantamount to an allegation that the creatinine level of the specimen was greater than 5.0.

the contract, 3) conduct by the third party to intentionally and improperly procure the breach of the contract, and 4) damage to the plaintiff as a result of the breach. *Albert*, 239 F.3d at 274. Moreover, at-will employees, like Van Heule, must establish that the third party engaged in fraud or misrepresentation or acted with malice in order to state a claim for tortious interference. *Id*.

Defendants specifically dispute that any conduct by LabOne *caused* Delta to breach Van Heule's employment contract. Defendants argue that LabOne merely reported the testing results to Delta and that Delta made an independent decision to terminate plaintiff's employment. Def. R.56.1 ¶¶ 18, 19, 38, 39. Moreover, LabOne denies that it acted with malice or intent to defraud. *Id*. ¶ 49. For these reasons, plaintiff's motion for summary judgment on her claim of tortious interference must be denied as well.

C.    *Collateral Estoppel*

Finally, Van Heule argues that LabOne is estopped from defending her negligence claim because of the result in *Ishikawa v. Delta Airlines, Inc.*, 149 F. Supp. 2d 1246 (D. Or. 2001), *aff'd* 343 F.3d 1129, *amended by* 350 F.3d 915 (9th Cir. 2003). "Under the doctrine of offensive collateral estoppel, a plaintiff may preclude a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff." *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005). In *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38 (2d Cir. 1986), the Second Circuit outlined a four-part test for determining whether a collateral estoppel bar should apply:

> (1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final

judgment on the merits.

*Id.* at 44.  *See also S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 304 (2d Cir. 1999).

Moreover, collateral estoppel is appropriate only when the applicable legal principles and laws

have not changed since the prior proceeding was concluded.  *Comm'r of Internal Revenue v.*

*Sunnen*, 333 U.S. 591, 599-601, 68 S. Ct. 715, 720-21 (1948).

Plaintiff in *Ishikawa* was a flight attendant employed by Delta Air Lines.  In September,

1999, plaintiff was directed to submit to a random, routine drug test.[11]  Ishikawa's urine

specimen was sent to LabOne.  As in Van Heule's case, LabOne conducted validity testing on the

specimen and ultimately reported to Delta that Ishikawa's specimen was "substituted."  The

results of Ishikawa's validity testing indicated a specific gravity of 1.0 and a creatinine level of 5.

In her complaint, Ishikawa alleged claims of defamation, negligence, misrepresentation, and

wrongful discharge.  With respect to her negligence claim, Ishikawa alleged that LabOne was

negligent in several ways, including "failing to record and report measurements beyond the

decimal point."  Mortati Aff. Ex. B, Jury Instructions at 3.[12]

The jury found LabOne negligent in Ishikawa's case.  The verdict sheet, however, did not

ask the jury to identify the particular conduct that led it to decide that LabOne was negligent.

Instead, the verdict sheet simply asks, "Has plaintiff, Yasuko Ishikawa, established by a

preponderance of the evidence that LabOne was negligent in analyzing and reporting the results

of her urine sample *in at least one of the ways alleged*, and that LabOne's negligence was a cause

---

[11] The facts of the *Ishikawa* case are taken from one of the several reported decisions
issued during the course of that litigation, and may be found at 149 F. Supp. 2d at 1248 *et seq.*

[12] "Mortati Aff." refers to the Affidavit of Thomas Mortati, dated July 18, 2003,
submitted in opposition to plaintiff's motion for partial summary judgment.

of damage to plaintiff?" *Id.* (emphasis added). Because of the wording of the verdict sheet, it is not possible to determine the basis for the *Ishikawa* jury's finding that LabOne was negligent. Van Heule has thus failed to establish that the issue in the prior proceedings was "actually decided," as *Gelb* requires before collateral estoppel may be applied.

Moreover, a pertinent federal regulation was amended *after* Van Heule's specimen was tested but *before* Ishikawa's specimen was. Van Heule's specimen was tested in November, 1998; Ishikawa's specimen was tested in September, 1999. In the interim, on July 28, 1999, HHS issued Program Document 37 ("PD 37"). PD 37 provides that

> truncating a quantitative value is not acceptable with '≤' decision points or cutoffs. In '≤' scenarios; truncating would change the result from acceptable to unacceptable (e.g., truncating . . . a creatinine of 5.4 mg/dL to 5 mg/dL). Values from tests for creatinine . . . should contain one significant decimal place more than that specified in the stated decision point.

Thus, the relevant law changed after Van Heule's specimen was tested but before LabOne tested Ishikawa's specimen. For this reason as well, collateral estoppel is not warranted.

## CONCLUSION

For all these reasons, defendants' motions to dismiss are denied in part and granted in part. Plaintiffs' claims for fraud, intentional tort, and prima facie tort are dismissed; plaintiffs' claims for tortious interference and negligence may proceed. Plaintiffs shall voluntarily withdraw their claims for deceptive business practices or submit a memorandum of law explaining why they should be permitted to proceed no later than January 20, 2009. Van Heule's motion for partial summary judgment is denied in its entirety.

**So Ordered.**

_____/s/_____

**Steven M. Gold**
**United States Magistrate Judge**

**January 6, 2009**
**Brooklyn, New York**